Third case this morning, Federal of the United States v. Ken Dixon. Mr. Schweitzer. Good morning, Your Honors. I'm Brooks Schweitzer from the Federal Defender's Office. And together with Mr. John Levy, I represent Mr. Dixon in this appeal. At this time, I'd like to reserve three minutes of my time for the bill. Very well. Thank you. Your Honors requested that we respond to the government's contention that this case is controlled by the Revy decision, so let's direct it otherwise. I thought I'd start there. Revy does not control the case for a couple of reasons. First of all, there was an express reservation of this issue in Revy. Revy, of course, dealt with the FSA's application to those who had already been sentenced before the FSA's enactment date. In footnote 5, the court said, we will need to consider the issue of whether the FSA would apply via an implied extinguishment of the penalty to those sentenced after the enactment date. That's not this case. But Revy did analyze the savings cost, didn't he? It certainly did, Your Honors. Isn't the analysis the same here, irrespective of there being a different posture in two cases? Sure. The analysis is actually quite different. And that's because the issue, the fundamental reason why the FSA applies to those sentenced after August 3rd is the emergency guideline amendment authority that is provided for in the Act. Now, the guideline amendment authority, new guidelines apply to only people who have yet to be sentenced, unless they're made retroactive, which, of course, they were not directed to be made retroactive in the FSA. So the thrust of the argument with respect to those post-enactment is that the new guidelines, the emergency authority for the new guidelines indicates congressional intent that the mandatory minimums are to apply as of the date of enactment. That argument applies not at all to folks like Mr. Revy, who had already been sentenced. New guidelines don't apply to him. He's already been sentenced. So the arguments are quite different. Mr. Dixon was sentenced just after the new guideline went into effect, after the FSA went into effect. When was after that? About two months. About two months ago. Yeah. The FSA occurred, the FSA became effective on August 3rd. Mr. Dixon was sentenced on October 25th. The guidelines were promulgated by that time. The emergency guideline amendments were promulgated that time. It actually took effect several days later on November 1st. So this case is quite different from Revy and the court. They essentially saved the issue in Revy for this and other cases. Now, the government proposes a very straightforward and simple analysis in a case like this, as they did in Revy and some other cases, which is that Section 109 directs a strict and viable express statement requirement for a repealing act, such that if there isn't a word in the repealing statute, saving the penalty is extinguishing the old penalty. It's saved by 109. That's it. Our contention, and we believe the law bears this out from the get-go in terms of the Supreme Court's analysis of 109, is that that's not how the statute works. We don't disagree that retroactivity has to be expressly provided for. We don't disagree that that's what 109 says. There's no argument about that. There's no debating what language is in the act. The issue is, is that a binding dictate? And essentially the first time the Supreme Court interpreted 109 was back in the early 1900s in several cases. The act was passed in 1871. And the first two principles the Court enunciated under 109 were, number one, that because it's a statute and it's not a constitutional provision, its express statement requirement isn't binding. In other words, the penalties given are not binding. Did you just say that the term expressly provided is not binding because it's a statute? Yes, and this is why, Your Honor. An express statement requirement such as in 109, and these sorts of requirements exist in other laws as well, is a limitation on the legislative power. It's one legislature saying to another future legislature, you can't enact, you can't amend this law or you can't change the effect of this law unless you do so in a particular way. In essence, 109 says you can't change this law unless you expressly change the law. Exactly. Now, the one trouble I have with your argument is looking at 109, where is the Supreme Court, of course we'll bond on what the Supreme Court says, but I have trouble figuring out where the Supreme Court got the words by fair implication in grade and order. I don't see that in 109 or its predecessor. It's not in 109, Your Honor. It's not in the predecessor. Where it is, it's derivative of the Constitution. In other words, what the Supreme Court of Great Northern said was because this is a statute and not a constitutional provision and one legislature cannot bind a future legislature's legislative power, that's a fundamental Article I principle that the legislative power is only defined and limited in the Constitution for all Congresses. One Congress can't hamstring another. That's where the principle comes from. So essentially the first time the statute comes up, obviously the Supreme Court is faced with the language that Your Honors are faced with, but the Court appropriately said, well, we can't enforce this as it's written. There must also be a route to find establishment through the implication. In other words, through basic statutory construction. We're always looking to what the Great Northern was deciding. What, 1907? That's correct, Your Honor. Okay. So for 103 years prior to the Fair Sentencing Act, Congress was on notice of the Supreme Court's interpretation of the Sentence Clause. That's correct, Your Honor. I will point out this is not an area of the law where there are many cases. This is a relatively obscure area of the law. There are a handful of Supreme Court cases over 150 years, a couple of cases by this Court as well. But it's true. Great Northern Railway established that benchmark principle. But it's not alone. A few years later, Kirks v. Woodman, the Supreme Court properly noted that 109 is a canon of construction. And that's all it is. It's a canon of construction. That's Kirks v. Woodman in 1908. Now, again, the principle here, the express statement principle, is not, as I said before, limited to 109. So when we take a step back and look at, as I said, there are 109 cases. When we take a step back and look at the Supreme Court's express statement jurisprudence, in other words, looking at other cases, other statutes where this comes up, we find the same result. In Marcello v. Bonds, the Supreme Court was interpreting an express statement requirement in the Administrative Procedures Act. And there, when it came to interpret a later statute, the INA, and the Supreme Court was faced with the situation of the APA's express statement requirement, which said, APA procedures apply unless a future statute identifies this particular APA section and exempts it. Can you say a criminal case that maybe distinguished Marrero? You're familiar with Marrero, which the Supreme Court held a congressional statute liberalizing parole requirements was not retroactive. Absolutely. And Marrero is not... The only thing that Marrero speaks to with respect to this case is that ameliorative sentencing laws are subject to a saving analysis. And we don't dispute that. Marrero doesn't say anything... But how is that very different from the circumstances in Dixon? Well, what Marrero held was that the prohibition on parole eligibility is a penalty, as that term is used in Section 109. That's Marrero's holding. And then, which... There's no analogy here to this case. We're not... There's... We've argued in the briefs that there's a procedure penalty distinction. I think while we preserve that argument for further review, I think maybe essentially forecloses that argument at this point in time. But Marrero says nothing else about implied extinguishments or express statements or anything else. Marrero doesn't really say anything on the point. What's critical is the unbroken line of Supreme Court cases, pointing their arms to Greg Norton's early hurts, also in Marrero. But then there's also... And this is a case that we cited in the 20HA letter that we filed last week. The principle of a non-constitutional limit on legislative power, which is what the express statement requirement is, that was also held in Manigault to be unaffective. Now, there wasn't an express statement requirement. It was one legislature saying no private bills can be passed unless there's public notice, sort of a good government provision, a statute, a legislature passed. And then later on, private bills passed and not in compliance with those requirements. And some of the Supreme said, well, this act is invalid. It violates this statute, just like the government says that 109 laws are in effect here. And the Supreme Court said, no, that's not how the legislative power works, that these non-constitutional limits on power can be disregarded by future legislatures. They're not empty letters. That's the important point. They are cannons of construction. And we don't run away from that. Section 109's requirement, and as articulated in the Great Northern Railway, is that there must be a clean import in the statute, in the repealing statute, to extinguish a penalty. That's the cannon of construction that applies here. I gather you buy into the argument in Douglas, the discussion by Judge Morgan that Congress must have intended to ameliorate circumstances like this. Yes, Your Honor. And when we move on to Congressional 10, getting past the purported bar of 109, here is very strong evidence of Congressional 10, primarily Section 8, which deals with the Emergency Guideline Amendment Authority. And again, the point here is that... Are you suggesting we look at legislative history, or are you arguing that we look at the statute as a whole and look at Section 8? I'm suggesting that the Court, it's a modest proposal, which is that the Court do what the Court does in every single case of statutory construction, which is apply the standard rules of construction in determining the intent of Congress. Here, I can see the text is not helpful, and not hurtful to us. It's just not... It doesn't really indicate anything. What's next is the structure of the statute, the purpose, various cannons, the odd results cannon, the common sense cannon, and also the legislative history. So all that together, and I think primarily the strongest argument for us is with respect to Section 8, and that is with the Emergency Guideline Amendment Authority. But Section 8 comes in, and you're looking at using the cannon of intent as opposed to having to wait to get to legislative history, does it not? Section 8 comes in in determining intent, and that would be the cannon of looking to the structure of the statute, looking to the statute as a whole to determine what is the intent of Congress, which is what we're after, you know, at the end. I see my time's up. If I could ask one other question. Does that analysis enable us to distinguish this case from Jacobs? It certainly does, Your Honor, and Jacobs is distinguishable on a couple of grounds. First of all, it was, just as a footnote point, first, it was a penalty case like Marrera. The holding was, you know, is a probation... I'm sorry, is a change in the classification of the offense. Did that affect a change in penalty? But setting that aside, Jacobs is often cited by the courts in this FSA litigation as barring looking to legislative history or barring past express intent, and it actually doesn't say that. When you look at Jacobs, what it says is that the defendant in that case pointed to legislative history in the first, the repeal law. Okay, there's always in these situations two laws. There's the original law and there's the repealing law, and what Jacobs said was that we don't look at the repeal law or anything about intent with respect to the repeal law. You know, the point is that we would look at the repealing law, the second law. That's what we need to look at to determine the extent of the extinguishment. So really, that's what Jacobs is talking about. Jacobs did apply the Savings Clause to Barr. Absolutely. And in many cases, apply the Savings Clause. My colleague suggests that that somehow means that our recognizance of 109 is wrong. That's not what it means at all. It essentially means that a can of construction has been applied in numerous cases. It doesn't mean that it's binding or anything else. We'll get you back, Mr. Switzer. Thank you. Mr. Salzman? I can't help thinking, Mr. Salzman, it really is an unjust result. I mean, it's just terrible. You know, when you think about the requirement to five more years for essentially the same offense. I completely agree with you, Your Honor. Your Honor knows we're not in a comfortable position here today. We're arguing that Congress needs to address this. This is a matter for Congress. That's the problem that we have. My colleagues and I are prepared to have resents and proceedings for people if Congress decides that this act is retroactive, just as we did a couple years ago with regard to the crack amendments from the Sentencing Commission. But we have to apply the law. That's our problem. The sponsors of the legislation, Senators Leahy and I can't remember the name, and they're daring, have asked the Attorney General to reconsider. But you're suggesting it's not the Attorney General. It's Congress. Well, that's right. The Attorney General who I work for and I get my directives from has reconsidered this. We've looked at the law. We've looked at the saving clause. We've looked at the decisions of the Supreme Court and this court, and unfortunately we can't do by ourselves what the Senators now tell us they meant that it doesn't say in the legislation. But why isn't Mr. Schweitzer's argument about Section 8 a compelling one, particularly to ascertain what the intent was? Can I comment, Your Honor, in an indirect way? I want to start with this express requirement. Because, just to tell you where I'm heading, I'm going to say that this court has settled that it has to be express. And then my answer to Your Honor's question is going to be, that is anything but express. And it's not even an implication with regard to the mandatory minimums, which is what we're talking about here.  that's where we have to start. Mr. Schweitzer's argument, express, doesn't mean express, which it says in the Savings Statute. First of all, that is settled by Revey. Revey, I agree, does not get us through this entire case here, but it gets us a pretty far way because Revey held explicitly that the Savings Statute and its express requirement applies to this Act. Revey said, quote, in effect, the Savings Statute mandates that the court apply the penalties at a time the crime is committed unless the law expresses it. Mr. Schweitzer, let me ask you this question. It applies as to Revey, it applies as to Jacobs, if you get to Jacobs. If, in fact, Revey is contrary to Great Northern, don't we ignore Revey? Because Revey would be wrongly decided on that question. That's true, and I'd like to address Great Northern as well, which we did not do. Because it's hard to get by Great Northern as creative as perhaps that Supreme Court was in 1907. They clearly said, by fair implication, I don't agree, Your Honor. We briefed Great Northern in many cases, including Revey. We did not in this case because we're relying on Revey, but I'm happy to address it. And there are many briefs of the government and opinions of district courts that agree with us. Great Northern addresses a different issue. Great Northern involved a statute that had its own savings clause, which was somewhat obtuse, but it had a savings provision. The question before the Supreme Court in Great Northern was, what do we do with the general savings statute? How do we reconcile these two different savings statutes, the general one and the specific one? And it was only in that context that the Supreme Court in Great Northern said, we look to see whether the new savings statute expressly or by implication overrides the one we have before. It's the same context in which the Supreme Court mentioned Great Northern in Marrero, because Marrero involved a drug statute that had its own savings clause. Neither the Supreme Court nor this court has ever applied the implication language of Great Northern with regard to a statute such as the Fair Sentencing Act that has no savings clause of its own. One important decision of this court, which hasn't been mentioned yet this morning, is Caldwell. 1972 case, which is fairly directly on point with this matter, in which Congress repealed mandatory minimum penalties. The defendant committed his crime before the new act. He got two, five intermandatory penalties consecutively. And this court in Caldwell upheld it and in the process rejected just about every argument that this court has proposed. Now let me ask you another question here, which is maybe a postscript. And this is a little bit unfair as to you, that you were involved in this case. You know, this court's recent opinion in the case of Marcus Dupree precluded or in the opinion by Judge Hardiman said that the United States Attorney's Office cannot raise an argument that they didn't raise below. They didn't raise in their brief. And when I say this is unfair to you, although you argued Dupree, you didn't author this brief. I just think that at this stage for the government to come in to make the savings clause argument is a bit unfair to the defendant. How do you answer that question? Well, I answer that, Your Honor, as I said, because we're relying on Reidy. Reidy fully addressed this issue and was fully briefed in Reidy as to whether a repealing statute needs to be expressed. But it is not briefed in this case. Now, I said it's unfair to you because you stepped in, but since you're partnering with the Middle District, I think that there has to be some level of responsibility between the respective offices. Oh, I agree, Your Honor, but I think with respect that that suggestion would not be disrespectful for me, but I don't think it would be fair to the government because the government is relying on a precedential decision of this court, Reidy, that enforces the express requirement of the savings statute over the exact same arguments that are being presented this morning. I don't think the government weighs an issue in any way by simply relying on the on-point precedent that was decided a few months ago. If this panel, of course, wishes to disagree or even present the matter on bank, that would be a different matter, but no, I don't think that we've weighed it. The question has come up to essentially re-argue Reidy, and I'm prepared to do that, but I don't think the government did anything wrong in its brief by not re-arguing a precedential decision of the Third Circuit. You answered my question. So, Reidy, we think, does hold that, but if we are re-arguing it, we don't believe the Great Border Contradicts it. We have the cases of this Court, Caldwell and Jacobs, that have enforced the savings statute according to its terms. And, of course, Reidy, and that is our position. Then we get to, I'm getting back to where Your Honor appropriately asked me the question of, well, what do we do about this act? Well, first of all, clearly, Mr. Schweitzer acknowledges there is no express provision in the Fair Sentencing Act that repeals the prior penalties. And so what they are trying to do is do it by implication. We don't think that's permissible, but we don't think that even that effort succeeds just by looking at Section 8 of this act with regard to the Sentencing Commission. I think it was Judge Gibson in the Western District in an opinion who described this argument as convoluted. It's applying to Congress the idea that by addressing the application of sentencing guidelines going forward, that Congress meant to repeal mandatory minimum penalties that apply to defendants who committed their crimes earlier. That's not even an implication in fairness, in our view. Congress has always applied mandatory minimum sentences because it wants to assure that the most serious offenders get a particular sentence and take away any discretion that the district judge has to give a lower sentence. That's what a mandatory minimum is. And to say to the Sentencing Commission, we think you should fix your guidelines to get it in line with what we're doing, simply doesn't address the question at all of how to treat the people who faced mandatory minimum at the time they committed their offenses. And so that's why we're in this regrettable position of saying that the precedent of this these people are not in a good spot and it's Congress to address it. Do you think it's Congressional oversight or do you think Congress I'm asking you to tell me what you think Congress did or didn't do which is almost impossible. Do you think it was an oversight or do you think that they intentionally wanted pending cases to be subject to penalties? On that point, I think that the Seventh Circuit in Fisher, the one Seventh Circuit decision on this very issue before us, that agrees with the government's view that even people sentenced after the effective date of the Fair Sentencing Act cannot get retroactive application. I think Fisher hit that nail right on the head. And what the court said there is this is compromised legislation. You can ask your honors a very good question not just about this retroactivity issue but about everything in the act. When they come up with 18 to 1 there was a ratio of 100 to 1. There's no empirical testimony or anything before Congress as to why the 18 to 1 ratio better reflects the severity of crack cocaine in relation to cocaine powder. This was a compromise. This was a highly contested, difficult issue that faced the country for many years involving crack sentencing. They came up with this compromised legislation that everybody was content enough with and it passed, I think, unanimously. We acknowledge that Fisher did not analyze Section 8. It did not. No, it didn't. But there are many other cases that do and have made the argument that I've made that it just doesn't address the specific issue. But to answer Judge Franklin's question we don't know why Congress did what it did here. It had this matter before and it came up with a way to ameliorate the penalty but not extensively. Isn't it possible, of course, this is because this asks you to speculate but the prior question also asks you to speculate. Ever since the Sentencing and Reform Act of 1985 it was clear that at the time of sentencing you used the guidelines that affected the time of sentencing. Correct? Yes, sir. Isn't it conceivable that Congress when they had the two versions of the Act the House version and the Senate version just assumed, well the courts are going to use what they have before them at the time of sentencing and the Fair Sentencing Act is the Act that will apply. That's why we're saying adopt emergency guidelines within 90 days? Well, the problem with that, and the reason I don't think we can speculate that, is the saving statute. That's the clear, unambiguous law that's been on the books for 140 years that Congress, I'm sure, is fully familiar with. And this fundamental principle that ameliorative legislation does not apply retroactively. The interesting point, Your Honor, is that even while the saving statute has been uniformly enforced over the years with regard to criminal penalties in Marrero and Caldwell and all these other cases, the arguments that are being raised here apply every single time. Every time Congress lowers a criminal penalty it may not happen that often, but over 140 years it has happened. Every time. It's because Congress thinks the old penalty was harsher than it should be. In fact, the saving statute applies even where Congress erases a crime altogether, where a new Congress says, we don't think what used to be criminal should even be criminal anymore. Was that the original focus of the saving statute? It was, exactly. And so the saving statute has always been on the books, stating a clear principle that Congress is aware of, which is, if you're going to do this, despite your best intent, and despite your view, that the old penalties were too harsh. The old penalties are going to continue to apply to the people who committed their crimes when they face those penalties. In this context, has any court applied this new statute retroactively? Well, there are many district courts that have it on, and a number of them I believe are cited in the briefs. Many district courts in this situation if someone is sentenced, they have to be effective day of the act. How apply retroactively the government's objection? Many other district courts have disagreed. So far, the circuits are unanimous. The circuits are unanimous. I think almost every circuit has ruled, as in reading, that the Fair Sentencing Act does not apply retroactively to people who are on direct appeal. And then we have Fisher, so far, from the 7th Circuit, that says it doesn't apply to somebody sentenced afterwards. So, now, in this district, I can tell you, I don't speak as well for the Middle District as has been pointed out, but in the Eastern District, we've had one judge who has applied it retroactively. In this situation, the government took an appeal to maintain its consistent position, which is pending. We have many other district judges in the Eastern District who have refused the defense argument here and have not applied retroactively. Is there a case that's waiting for our decision in this case? No, not quite. The case that the government appealed is called Heine-Spemetz, J-A-I-N-E-S-P-I-N-E-N-T-Z. That's been briefed, but there's been no schedule for that. There are other cases that this is one of the cases, a defense appeal, that is scheduled for now, next month. So, there are many cases. That's the Jackson case? That's the Jackson case. In the Jackson case, which was, again, it's all based on the timing of when these briefs were written, the brief in the Jackson case, which we did move to consolidate, but the court elected not to, does fully address Greg Nordner and all the other issues that we've been talking about, because it was briefed at a slightly different moment in time if my recollection is correct. So, again, I'm not happy to be here. I won't mind attending resentencing hearings, but we believe it's the government's obligation and the court's obligation to enforce the laws that's written in the same statute. It doesn't change the length of a sentence much, does it? I mean, there are concurrent sentences, right? Yes, but we recognize that under the sentencing package doctrine that the court might reconsider the sentence that he received for the gun count. Just a brief note, I know I only have about 20 seconds left, but the interesting thing, we've talked about the unfairness of this, and there's no doubt about it. Mr. Dixon is probably not the best candidate for arguing unfairness, and that Judge Jones pointed out to him. He negotiated this plea deal before the act was filed, and as part of the deal, the government dismissed 30 years' worth of mandatory penalties for the 924C counts, and he agreed, I'm sure believing that he would receive this 10-year mandatory sentence, so Judge Jones was fairly critical at sentencing of the effort that was made here. That's not to say that many other defendants are not in a more sympathetic position. So to answer Your Honor's question, Judge Nygard, if he did go back for resentencing, Mr. Dixon theoretically could fare better because he would be he would probably receive the benefit of the new lower guidelines. His guidelines would go down, I think, to 84 to 105. So perhaps he could get a better sentence on the drug count, and perhaps the judge would reconsider the concurrent sentence on the gun count. However, if you read the judge's statement, I'm not sure that that's very likely. Do you know if there are many cases like this pending? I mean, any decision on our part would probably have, I thought, a fairly short shelf life. Well, I don't think it has a short shelf life unless the Supreme Court gets involved, but there are many cases. Well, we're dealing with everyone who committed their crime before August 3rd of 2010. So this issue, theoretically, could be with us for another five years until the statute of limitations runs out. And to answer Your Honor's question, there are many, many cases presenting this. As I said, the government has prevailed in a number of cases in the district courts and not prevailed in others. The government has filed appeals in many circuits. I get a list every week, which seems to grow longer, just to try to maintain a consistent position. Doesn't that make the analysis of Section 8 all the more important? It's very important, and it certainly has to be considered. But again, we look at Section 8 and we don't see anything that addresses a mandatory minimum penalty for a major offender before the enactment of the Act. And that's even assuming that you can make that sort of implication, which we don't think the state statute permits. Thank you, Mr. Soutzman. Mr. Schweitzer. Mr. Schweitzer, what about Mr. Soutzman's argument about Great Northern and the fact that Great Northern specifically had a savings clause in that statute? The short answer, Your Honor, is that the Supreme Court has not held that to be a limiting principle. We have already said that. In Great Northern itself, it's said that we look to the terms of the law as a whole, of the repealing law as a whole, to look for an implication. We don't look for a savings clause. We don't limit it to some myopic focus on a particular provision. We look to the terms of the repealing law as a whole. That's Great Northern. In Allen v. Grand Central Aircraft, that's 347 U.S. 535. The Supreme Court, in that case, that was a temporary re-stimulization law, which is also subject to 109, under a different language than 109. It's just one law issue there. I said before, we always have two laws in these cases. That's the situation where you have one law, one savings clause, and the Court, in that case, said there's no express statement and there's no implied statement. It did an implied analysis where there's one savings clause at issue. Then again, when we generalize it, Marcello involved one savings clause, and that was with respect to the express statement requirement in the APA. Manigault, the 1905 case, involved didn't involve two provisions at all. It involved one provision. Again, there, that's where the Court said this public notice requirement is not enforceable. More importantly, the rationale behind the rule, behind the limitation on the binding effect of an express statement requirement, it's a constitutional principle. It doesn't have anything to do with the content of the second law. I would just really emphasize the point that Greenwood is not an outlier here. Without relying on some hundred-year-old victim in some case, I would really work towards Justice Scalia's concurrence in Lockhart, where he meticulously demonstrates the history of this. I think that's an important reference for you to remember. Now, with respect to odd results, which is something I didn't really get to mention at my first part of my argument, but this is an important candidate of construction. The avoidance of odd results are nonsensical, non-common-sense effects of a statute. Here, we have two Where would you help me out? The odd results, the Court said it's an established candidate of statutory construction that you don't read a lot of absurd results. That's been said in numerous cases. There are definitely different sentences because of the passage of the new law. Well, Your Honor, I think the odd result here and principally one odd result is on the government's reading of the Fair Sentencing Act and who it applies to, two people, two defendants, both committed their offenses before the FSA. If you have a major crack offender, he's going to get the benefit of the amelioration. What would you say to the argument that the new law, of course, ameliorates, the difference being five years in prison, mandatory five years. But Dixon committed an offense at a time when the old law was in effect requiring ten years in prison, but he knew that. Why would that be unfair to punish him under what he knew was the law that existed then, ten years? Why is that unjust? It may or may not be unfair or unjust, but respectfully, luckily, it's not our call to make, essentially. But that was his call to make. He made a decision to commit a crime at a time when the sentence was ten years. I understand that, Your Honor, but what I'm trying to say is the court's task is one of statutory construction, so all we're looking to here is what the Congress intend. Now, the court can read itself the burger, I think, of determining what the best, most just result here, although I think that in the context of interpreting the statute and looking to odd results and so forth, part of that certainly does come into play. Now, with respect to the other aspect of odd results, so to speak, is the position that this puts district courts in. And again, this is in the context of interpreting what could Congress have meant. Did Congress really intend for five more years for innumerable sentencing courts to calculate, go through empty tasks of calculating meaningless guidelines that are willing to then just be supplanted by an old mandatory minimum? Can we say it's an odd result, given, let's say Mr. Salzberg's point that, you know, this is a compromise. Congress does this all the time. There's what may, what I don't think I'm in a position to say exactly how the pie was cut with respect to this statute. All the court and all the, frankly, Mr. Salzberg and myself, all that we can do is look to the indicators of congressional intent. Now, unfortunately, this, I admit, to be honest, this is a difficult case of statutory construction. However, that's the job of the court. And I would suggest to the court that it's not powerless here with respect to the tools that it has to determine that. Both Section 8, very strong indicator of congressional intent here. And all of the odd results of asking district courts for five years, especially in this context of the racially disparate impact of these sentences, to ask district courts to undertake what I have to imagine is a singularly distasteful chore for five more years. The court is well within its bounds to say, is that what Congress intended? I don't think not. I think it doesn't look fair. Thank you, Mr. Salzberg. Mr. Salzberg, thank you very much. Very well presented.